Reuben D. Nathan, Esq. (SBN 208436)
**NATHAN & ASSOCIATES, APC**
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

Ross Cornell, Esq. (SBN 210413)
**LAW OFFICES OF ROSS CORNELL, APC**
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

Attorneys for Plaintiff, JONATHAN KROSKEY

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JONATHAN KROSKEY, on behalf of himself and all similarly situated persons,<br><br>Plaintiff,<br><br>v.<br><br>BBC GLOBAL NEWS US, LLC; BBC.COM LIMITED; and BBC STUDIOS DISTRIBUTION LIMITED,<br><br>Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT**<br><br>1) Cal. Penal Code § 631<br>2) 18 U.S.C. § 2511(1)(a)<br>3) Cal. Bus. & Prof. Code § 17200, *et seq.*<br>4) Cal. Constitution Art. I § 1<br>5) Intrusion Upon Seclusion<br>6) Unjust Enrichment |

1

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1.    Plaintiff JONATHAN KROSKEY ("Plaintiff") files this class action complaint on behalf of himself and all others similarly situated (the "Class Members") against Defendants BBC GLOBAL NEWS US, LLC, BBC.COM LIMITED, AND BBC STUDIOS DISTRIBUTION LIMITED (collectively, "Defendant" or "BBC"), and alleges as follows:

## I.    NATURE OF THE ACTION

2.    This is a class action lawsuit brought on behalf of all California residents who have accessed and used www.bbc.com (the "Website"), an online news platform that Defendant provides for public access and use.

3.    During his use of the Website, Plaintiff navigated to multiple pages addressing sensitive personal subject matter, including the page URL identifying his on-site search for the term "Addiction," the page URL identifying an article concerning psychedelic-assisted smoking cessation, and the page URL identifying an article concerning psychedelics and gender and sexuality, unaware that Defendant was causing and permitting third parties to intercept the content of his communications and to associate those contents with persistent, cross-session user identifiers.

4.    Defendant caused the interception of the contents of Plaintiff's communications with the Website, including the page URLs identifying what he was browsing, the page titles and topical tag values identifying the subject matter of those pages, the referrer URLs reflecting prior navigation paths, and persistent identifiers tying those communications to Plaintiff across browsing sessions.

5.    Defendant surreptitiously embeds and operates third-party tracking technologies on the Website that intercept the contents of Plaintiff's communications with the Website, capture page URLs and corresponding page titles and topical tags, and transmit those contents alongside persistent user identifiers to the operators of those third-party tracking technologies for the third parties' own commercial purposes.

6.    Defendant deploys these interception technologies in violation of the California Invasion of Privacy Act, Cal. Penal Code § 631, and the Federal Wiretap Act,

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

18 U.S.C. § 2511(1)(a). Defendant has done so for years, generating revenue from the surreptitious commercial exploitation of the contents of users' communications, including those of Plaintiff and the Class Members.

7. Plaintiff personally used the Website during the class period and preserved an HTTP archive file (commonly known as a HAR file) of one of his own browsing sessions. Counsel caused a technical investigation to be conducted that replicated URLs and user flows presented in Plaintiff's HAR file and that documented the third-party tracking transmissions described in this Complaint. The figures and screenshots reproduced below are from that investigation and are included herein as illustrative examples of how the Website's tracking technologies operated when Plaintiff visited the Website.

## II.    GENERAL ALLEGATIONS

8. A web tracker is a tracking mechanism embedded in a website that monitors user interactions and transmits data to third-party servers. Trackers commonly take the form of small, transparent images, lightweight JavaScript files, software development kits ("SDKs"), or direct HTTP requests issued by the user's browser to third-party endpoints. Trackers operate automatically when a webpage loads, without requiring the user's knowledge or affirmative action.

9. When triggered, trackers cause the user's browser to transmit data to third-party servers, including the contents of the user's communications with the host website such as page URLs identifying what the user is viewing, the corresponding page titles, topical tag values identifying the subject matter of those pages, referrer URLs reflecting prior navigation paths, and persistent identifiers that tie those communications to a particular user across browsing sessions.

10. When users visit the Website, Defendant causes tracking technologies to be embedded in visitors' browsers. These include, but are not limited to, the following (collectively, the "Trackers"):

- The Permutive Tracker;

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

- The Piano Tracker; and
- The Google Ad Manager Tracker

11.     The third parties who operate the above-listed Trackers use the intercepted contents of users' communications collected via the Website for their own independent commercial purposes tied to broader advertising and audience-data ecosystems, including audience segmentation, behavioral profiling, real-time ad targeting, and cross-site identity resolution.

12.     The Trackers are operated by distinct third parties, including Permutive, Inc. (as to the Permutive audience-data tracker), Piano Software, Inc. (as to the Piano analytics and experience tracker), and Google LLC (as to the Google Ad Manager publisher-advertising tracker). Each is an independent commercial actor that maintains its own infrastructure, controls its own platform, and processes data captured through the Trackers for its own purposes, separate from any service rendered to Defendant.

13.     Defendant knowingly embeds and deploys the Trackers on the Website and configures them to execute automatically within users' browsers during the page-load process. As a result, Defendant causes the browsers of California users, including Plaintiff and the Class Members, to transmit the contents of their communications with the Website, in real time and during the page-load process itself, to the third parties operating the Trackers.

14.     The third-party tracking code executes contemporaneously with each page load initiated by Plaintiff's browser. The page-load process for a modern news webpage is not a single instantaneous event; it consists of many successive steps that the browser performs in sequence and in parallel, including the initial HTTP request and response for the page URL, the parsing of the returned HTML markup, the fetching and execution of embedded scripts (including the Trackers), the fetching of stylesheets, images, fonts, and other linked resources, and the rendering of the page to the user.

15.     During that same page-load process, before the page-load process completes, the Trackers cause the browser to issue separate, parallel outbound requests

4

to third-party endpoints carrying the contents of Plaintiff's communications with the Website and persistent identifiers tied to Plaintiff. The interception of Plaintiff's communications by the Trackers is contemporaneous with, and occurs during, the transmission of those communications to Defendant.

16.    As set forth in the figures below, independent technical analysis of the Website's tracker architecture confirms that, during the page-load process, the Trackers dispatch outbound requests to Tracker endpoints. Each of those Tracker requests fires automatically, without any user interaction or affirmative action, and is dispatched during the page-load process before the page-load process completes, carrying the contents of the user's communications with the Website and persistent identifiers tied to the user. Plaintiff alleges on information and belief that the same tracker conduct operated on the Website during Plaintiff's visit.

17.    Plaintiff and the Class Members did not consent to the installation, execution, embedding, or injection of the Trackers on their devices, did not consent to the contents of their communications with the Website being transmitted to the third parties operating the Trackers, and did not consent to the use or commercial exploitation of those contents by Defendant or by the third parties.

18.    Generalized references herein to users, visitors, and consumers expressly include Plaintiff and the Class Members.

### III.    PARTIES

19.    Plaintiff JONATHAN KROSKEY is a California citizen residing in Santa Clara County, California, and has an intent to remain there. Plaintiff was in California when he visited the Website, which occurred on or about May 1, 2026.

20.    Defendant BBC Global News US, LLC is, on information and belief, a Delaware limited liability company that operates and helps to make available the Website and its digital subscription services in the United States. BBC Global News US, LLC is identified in the BBC Global Terms of Use as one of the entities whose digital services are covered by those terms.

5

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

21. Defendant BBC.com Limited is, on information and belief, a United Kingdom private limited company that operates, controls, or helps to make available the Website to users in the United States, including in California. BBC.com Limited derives commercial revenue from the operation of the Website and from advertising and audience-data services delivered through the Website.

22. Defendant BBC Studios Distribution Limited is, on information and belief, a United Kingdom private limited company that operates, controls, or helps to make available the Website to users in the United States, including in California. BBC Studios Distribution Limited derives commercial revenue from the operation of the Website and from advertising and audience-data services delivered through the Website

23. Defendants own, operate, and control the Website, an online news platform through which BBC publishes news, feature, audio, video, and other editorial content to a global audience, including a significant audience of California users. Defendants conduct news, media, and publishing business nationwide and serve California users from the Website.

## IV.    JURISDICTION AND VENUE

24. Defendants are subject to personal jurisdiction in this District under Federal Rule of Civil Procedure 4(k)(1)(A) and California's long-arm statute, Cal. Code Civ. Proc. § 410.10, which authorizes the exercise of personal jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States.

25. Defendants have cultivated California as a significant market for BBC news reporting, editorial content, and digital media products. The Website serves as a primary digital channel through which Defendants reach California users, deliver content to California users, and monetize California users' engagement with that content through the sale of advertising and the activation of audience data.

26. In furtherance of those operations, Defendants caused, configured, or permitted the integration of third-party tracking technologies into the Website that are operated, in significant part, by California-headquartered companies. Google LLC, the

6

operator of the Google Ad Manager Tracker described herein, is a Delaware limited liability company with its principal place of business in Mountain View, California. Defendants knowingly directed user data captured through the Website to infrastructure and platforms operated by California-headquartered companies.

27. Through those integrations, Defendants embedded third-party tracking technologies into the Website that transmit California users' communications, including the contents of those communications and persistent identifiers, to data infrastructure and servers operated by California-headquartered companies and, in turn, to a broader ecosystem of advertising platforms.

28. Defendants deliberately reached out beyond their home jurisdictions by knowingly installing the Permutive, Piano, and Google Ad Manager Trackers onto unsuspecting California users' devices, including Plaintiff's device, thereby causing those Trackers to intercept and transmit the contents of California users' electronic communications.

29. The BBC Studios Privacy Policy, which Defendants direct to readers of the Website, confirms the conduct alleged herein. In Section 3(G) ("To show advertising to you on our services and understand how effective it is"), Defendants acknowledge that, when ads are requested and delivered on their digital services, Defendants share the user's "Cookie IDs or Mobile Ad ID" and "Page URL" with companies engaged in automated advertising trading and personalisation, and concede that "[g]enerally, these companies will be acting as separate data controllers."[1] In Section 4(C) ("Information shared via third party embedded content"), Defendants further acknowledge that the third parties who use cookies and similar technologies to provide a variety of services on the Website "may be independently making decisions about how and why your personal information is processed, meaning they are a separate 'Data Controller.'"[2]

---

[1] BBC Studios Privacy Policy § 3(G) ("To show advertising to you on our services and understand how effective it is"), https://www.bbc.com/pages/privacy-policy (last visited June 17, 2026).

[2] BBC Studios Privacy Policy § 4(C) ("Information shared via third party embedded content"), https://www.bbc.com/pages/privacy-policy (last visited June 17, 2026).

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

30. Defendants' purposeful direction of their tracking infrastructure at California, their commercial integration with California-headquartered Trackers, and their admissions in their own Privacy Policy are sufficient to support the exercise of specific personal jurisdiction in this District.

31. Plaintiff's claims arise out of and relate to Defendants' forum-related conduct. Plaintiff's communications were intercepted on his device in California, while Plaintiff was located in California, while Plaintiff was accessing the Website that Defendants direct at California users, and while California-headquartered Trackers were caused to receive the contents of those communications and persistent identifiers tied to Plaintiff.

32. Exercising specific personal jurisdiction over Defendants in this District comports with constitutional notions of fair play and substantial justice. Defendants are established global news publishers that operate and monetize a digital news platform serving California users and that have configured that platform to share California users' data with California-headquartered advertising and audience-data companies.

33. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff asserts a claim arising under federal law, specifically 18 U.S.C. § 2520, which provides a civil cause of action for violations of the Federal Wiretap Act, 18 U.S.C. § 2511(1)(a).

34. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the federal claim that they form part of the same case or controversy under Article III of the United States Constitution.

35. This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000, exclusive of interest and costs, there are more than 100 members of the proposed Class, and at least one member of the proposed Class is a citizen of a state different from at least one Defendant.

36.    Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(b) because (1) Defendants regularly transact business in this District, operate the Website that serves California residents in this District, and have caused tortious injury in this District through the interception of California residents' electronic communications; (2) a substantial part of the events giving rise to the claims occurred in this District, including the interception of Plaintiff's communications on his device in Santa Clara County and the transmission of those communications to California-headquartered Trackers; and (3) Defendants are subject to personal jurisdiction in this District.

## V.    FEDERAL AND STATE PRIVACY LAWS

### 1.    The California Invasion of Privacy Act (CIPA)

37.    The California Invasion of Privacy Act ("CIPA") is a legislative measure designed to safeguard the privacy rights of California residents by prohibiting unauthorized wiretapping and eavesdropping on private communications.

38.    Despite predating the Internet, CIPA has been applied to email and other Internet communications so long as that application is consistent with the statutory text and purpose. Section 631(a) reaches the interception of electronic communications carried by wire, line, or cable.

39.    CIPA's text and history confirm that the Legislature intended to protect core privacy rights, as reflected in § 630's declaration that the statute was enacted to protect the right of privacy of the people of this state. The statute provides for civil enforcement by private litigants whose communications have been intercepted without their consent.

40.    Individuals may pursue legal action against violators of Cal. Penal Code § 631 and are entitled to seek $5,000 in statutory penalties per violation. Cal. Penal Code § 637.2(a)(1).

### 2.    The Federal Wiretap Act

41.    The Federal Wiretap Act, enacted as Title III of the Omnibus Crime Control and Safe Streets Act of 1968 and amended by the Electronic Communications Privacy

Act ("ECPA") of 1986, prohibits the intentional interception of wire, oral, or electronic communications and provides a private right of action for individuals whose communications have been so intercepted.

42.   The Federal Wiretap Act applies to communications transmitted over the Internet. The 1986 ECPA amendments expressly extended the statute's protections to electronic communications as defined under 18 U.S.C. § 2510(12) to include the transfer of signs, signals, writing, images, sounds, data, or intelligence transmitted by a wire, radio, electromagnetic, photoelectronic, or photooptical system.

43.   A person whose electronic communications are intercepted in violation of 18 U.S.C. § 2511 may bring a civil action pursuant to 18 U.S.C. § 2520(a). Available relief includes the greater of actual damages or statutory damages of $100 per day per violation or $10,000, whichever is greater, plus punitive damages, equitable relief, and reasonable attorney's fees and costs.

## VI.   SPECIFIC ALLEGATIONS

44.   During his use of the Website, and as reflected in his HAR file, Plaintiff navigated to the following URLs, unaware that Defendant was causing and permitting Third Parties to intercept the content of his communications:

- https://www.bbc.com/search?q=Addiction+;
- https://www.bbc.com/future/article/20260430-magic-mushrooms-could-help-people-quit-smoking; and
- https://www.bbc.com/future/article/20251211-psychedelics-are-altering-how-people-see-their-own-gender-and-sexuality.

45.   Plaintiff alleges on information and belief that the tracking mechanisms described below operated on the Website during Plaintiff's visit to the URLs identified above and intercepted the substantive contents of his communications with the Website. The figures reproduced below reflect independent technical analysis of the Website's Tracker architecture and depict the same Tracker conduct that Plaintiff alleges operated during his visit.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

*1.      The Permutive Tracker*

46.      Defendant embedded and deployed a Permutive tracking mechanism on the Website, operated by Permuitive, Inc. through its audience-data and contextual-classification platform. The Permutive mechanism fires automatically during the page-load process and transmits data to Permuitive, including the full page URL of the page being viewed, the corresponding page title, topical tag values identifying the subject matter of the page, content classification labels, and a persistent user identifier that ties those transmissions to a particular user across browsing sessions.

47.      Figure 1 is a Fiddler Classic raw request capture showing an outbound POST request transmitted to Permutive during the load of bbc.com/future/article/20260430-magic-mushrooms-could-help-people-quit-smoking, the Website's article addressing psychedelic-assisted smoking cessation. The request body contains the JSON event payload, including the parameter client.url set to the full URL; the parameter client.title set to the corresponding page title; the parameter top_tags set to topical tag values identifying the subject matter of the page; the classifications_watson.taxonomy_labels parameter set to detailed health taxonomy classifications including substance abuse, mental health, and blood disorders; and the parameter user_id set to a persistent Permutive user identifier. The page URL, the corresponding page title and topical tags, the classifications, and the persistent user identifier all appear together in the same outbound request.

/ / /

/ / /

/ / /

11

**Figure 1**



48.    Figure 2 is a Chrome DevTools Application panel capture showing the browser's storage during the load of bbc.com/future/article/20260430-magic-mushrooms-could-help-people-quit-smoking, the Website's article addressing psychedelic-assisted smoking cessation. The Local Storage panel reflects a persistent Permutive identifier (permutive-id) stored on the bbc.com origin and a persistent Piano audience-segment identifier (_pdfps) carrying a detailed array of audience-segment codes. The value of the permutive-id stored in the browser matches the user_id transmitted in the outbound Permutive request and persists across browsing sessions, enabling cross-session user tracking and behavioral profiling tied to the sensitive health content being accessed.

/ / /

/ / /

12

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 2**



49.    Permutive's servers at api.permutive.com returned responses to the Permutive requests, including HTTP 200 OK responses, confirming that Permutive received and processed the transmitted data in real time, during the transmission of Plaintiff's communications with the Website, and before the page-load process completed.

/ / /

/ / /

/ / /

13

50.    Permutive's own published documentation describes its web JavaScript SDK as *"required to collect events and enable real-time cohort evaluation,"*[3] and states that its contextual integrations *"enrich[] your Pageview events with contextual classifications."*[4]

51.    Permutive, Inc. and its operators used the intercepted contents of Plaintiff's communications with the Website concerning sensitive health-related and other personal subject matter, including the page URLs (in the client.url parameter) and the corresponding page titles, topical tags, and content classification labels (in the client.title, top_tags, and classifications_watson parameters), in conjunction with the persistent Permutive user identifier (user_id), for their own independent commercial purposes, including real-time audience segmentation, behavioral profiling, cross-session identity resolution, and activation against advertising platforms.

52.    Permutive, Inc. is not a party to the communications between Plaintiff and the Website; it is a third-party interceptor that surreptitiously duplicated and captured those communications as they occurred. Defendant aided and abetted that interception by knowingly embedding and configuring the Permutive Tracker on the Website.

## 2.    The Piano Tracker

53.    Defendant embedded and deployed a Piano tracking mechanism on the Website, operated by Piano Software, Inc. through its analytics and audience-experience platform. The Piano mechanism fires automatically during the page-load process and transmits data to c2-eu.piano.io, including the full page URL of the page being viewed, the corresponding page title, topical tag values identifying the subject matter of the page,

---

[3] Permutive, Curation, https://docs.permutive.com/products/curation (last visited June 17, 2026) (under "Dependencies," describing the Permutive SDK as "Web SDK deployment required to collect events and enable real-time cohort evaluation").

[4] Permutive, OS Data Solutions, https://docs.permutive.com/integrations/contextual/os-data-solutions (last visited June 17, 2026) ("The integration enriches your Pageview events with contextual classifications . . . . Permutive automatically updates your event schema to include these properties.").

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

page description text, and persistent browser- and visit-level identifiers that tie those transmissions to a particular user across browsing sessions.

54. Figure 3 is a Fiddler Classic raw request capture showing an outbound POST request transmitted to during the load of bbc.com/future/article/20251211-psychedelics-are-altering-how-people-see-their-own-gender-and-sexuality, the Website's article addressing psychedelics and identity, gender, and sexuality. The request body contains the parameter url set to the full URL of a sensitive health- and identity-related article on the Website of the kind identified above; the parameter title set to the corresponding page title; the parameter tags set to topical tag values including Drugs, Gender, Health, and Mental health; the parameter description set to text identifying the article's subject matter; and the parameters new_bid and visit_id set to persistent Piano browser- and visit-level identifiers. The page URL, the corresponding page title and topical tags, the description, and the persistent identifiers all appear together in the same outbound request.

**Figure 3**

55. Figure 4 is a Chrome DevTools Application panel capture showing the browser's cookie storage during the load of bbc.com/future/article/20251211-

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

psychedelics-are-altering-how-people-see-their-own-gender-and-sexuality, the Website's article addressing psychedelics and identity, gender, and sexuality. The Cookies panel reflects persistent Piano cookies set on the .piano.io domain that enable session-level user identification and contribute to user profile building. The Local Storage panel additionally reflects the persistent _pdfps Piano audience-segment identifier on the bbc.com origin, carrying a detailed array of behavioral-targeting segment codes tied to the sensitive health- and identity-related content being accessed.

**Figure 4**



56.     Piano's servers at c2-eu.piano.io returned responses to the Piano requests, including HTTP 200 OK responses, confirming that Piano received and processed the transmitted data in real time, during the transmission of Plaintiff's communications with the Website, and before the page-load process completed.

/ / /

/ / /

16

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

57.    Piano's own published JavaScript SDK documentation directs website operators to dynamically create a script element, assign that element the external source *https://tag.aticdn.net/piano-analytics.js*, mark it asynchronous, and append it to the document head, and characterizes the result as *"Asynchronous loading"* and *"Non-blocking script execution."*[5] Piano's Instant Tracking documentation further states that *"This set of events are automatically tracked without any need for manual implementation aside from the SDK loading and configuration,"* and that the automatically tracked events include *"page.display"* and *"internal_search_result.display."*[6]

58.    Piano Software, Inc. and its operators used the intercepted contents of Plaintiff's communications with the Website concerning sensitive health- and identity-related subject matter, including the page URLs and the corresponding page titles, topical tags, and descriptions, in conjunction with the persistent Piano browser- and visit-level identifiers, for their own independent commercial purposes, including audience analytics, cross-session user identification, audience segmentation, and personalisation.

59.    Piano Software, Inc. is not a party to the communications between Plaintiff and the Website; it is a third-party interceptor that surreptitiously duplicated and captured those communications as they occurred. Defendant aided and abetted that interception by knowingly embedding and configuring the Piano Tracker on the Website.

/ / /

---

[5] Piano Analytics, JavaScript SDK, https://developers.piano.io/analytics/data-collection/sdks/javascript/ (last visited June 17, 2026) (recommended "Standard implementation" dynamically creates a script element, assigns it the source https://tag.aticdn.net/piano-analytics.js, marks it async, and appends it to the document head; described under "advantages" as "Asynchronous loading" and "Non-blocking script execution").

[6] Piano Analytics, Instant tracking, https://developers.piano.io/analytics/data-collection/how-to-send-events/instant-tracking/ (last visited June 17, 2026) ("This set of events are automatically tracked without any need for manual implementation aside from the SDK loading and configuration . . . ."; identifying page.display and internal_search_result.display among the automatically tracked events).

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

### *3. The Google Ad Manager Tracker*

60.    Defendant embedded and deployed a Google Ad Manager tracking mechanism on the Website, operated by Google LLC through its publisher-advertising platform. The Google Ad Manager mechanism fires automatically during the page-load process and transmits data to securepubads.g.doubleclick.net, including the full page URL of the page being viewed, content classification signals identifying the subject matter of the page, and persistent identifiers, including an identifier forwarded from the Permutive Tracker, that tie those transmissions to a particular user across browsing sessions.

61.    Figure 5 is a Fiddler Classic raw request capture showing an outbound request transmitted to Google Ad Manager during the load of bbc.com/future/article/20260430-magic-mushrooms-could-help-people-quit-smoking, the Website's article addressing psychedelic-assisted smoking cessation. The request contains the query parameter url set to the full URL; the query parameter set to a content-classification string including page_id identifying the specific article, top_tags identifying health, drugs, and psychology topical tags, pillar identifying the content section, and page_type identifying the page format; the query parameter ppid set to a persistent Google Ad Manager publisher-provided identifier; and the query parameter puid set to a persistent Permutive user identifier that has been forwarded into the Google Ad Manager request. The page URL, the content classification signals, and the persistent identifiers all appear together in the same outbound request.

/ / /

/ / /

/ / /

18

**Figure 5**

62. Figure 6 is a Chrome DevTools Application panel capture showing the browser's cookie storage during the load of bbc.com/search?q=Addiction+, the Website's on-site search results page for the term "Addiction." The Cookies panel reflects a persistent Google Ad Manager cookie (test_cookie) set on the .doubleclick.net domain, confirming the active Google advertising infrastructure on the Website and enabling Google's cross-site tracking capability via the DoubleClick network.

/ / /

/ / /

/ / /

19

**Figure 6**



63.    Google's servers at securepubads.g.doubleclick.net returned responses to the Google Ad Manager requests, confirming that Google received and processed the transmitted data in real time, during the transmission of Plaintiff's communications with the Website, and before the page-load process completed.

64.    Google's own published Google Publisher Tag documentation directs website operators to *"Load the GPT library by adding the following to the <head> of the HTML document,"* and identifies the loaded library as *https://securepubads.g.doubleclick.net/tag/js/gpt.js.*[7] Google further states that, by including the *async* keyword in the script tag, the browser is instructed *"to load the GPT*

---

[7] Google, Get Started with Google Publisher Tag, https://developers.google.com/publisher-tag/guides/get-started (last visited June 17, 2026) (step 2: "Load the GPT library by adding the following to the <head> of the HTML document. This code loads the GPT library from https://securepubads.g.doubleclick.net/tag/js/gpt.js.").

*library in parallel with other resources and page content, rather than blocking execution until the script is done loading."*[8]

65.    Google LLC and its operators used the intercepted contents of Plaintiff's communications with the Website concerning sensitive health-related and other personal subject matter, including the page URLs and the corresponding content classification signals, in conjunction with the persistent Google publisher-provided identifier and the persistent Permutive user identifier forwarded into the Google Ad Manager request, for their own independent commercial purposes, including real-time ad targeting, audience segmentation, cross-site identity resolution, and activation of the broader Google advertising ecosystem.

66.    Google LLC is not a party to the communications between Plaintiff and the Website; it is a third-party interceptor that surreptitiously duplicated and captured those communications as they occurred. Defendant aided and abetted that interception by knowingly embedding and configuring the Google Ad Manager Tracker on the Website.

## VII.    CLASS ALLEGATIONS

67.    Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class" or "Class Members") defined as follows:

> All persons within California whose electronic communications with the Website, including the URL contents of their HTTP requests to the Website, were intercepted by one or more Trackers between May 1, 2025 and the present.

68.    **NUMEROSITY:** Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more. The exact identities of Class Members can be ascertained by the records maintained by Defendant. Joinder of all Class

---

[8] Google, General Best Practices, Google Publisher Tag, https://developers.google.com/publisher-tag/guides/general-best-practices (last visited June 17, 2026) (under "Load GPT asynchronously," explaining that the async keyword "instructs the browser to load the GPT library in parallel with other resources and page content, rather than blocking execution until the script is done loading").

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Members is impracticable, and the disposition of their claims in a class action will provide substantial benefits to the parties and the Court.

69. **COMMONALITY:** Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions include but are not limited to:

- Whether Defendant configured the Website to transmit the URL contents of visitors' HTTP requests to the Trackers;
- Whether the URL contents of those requests constitute "contents" of electronic communications within the meaning of Cal. Penal Code § 631(a) and 18 U.S.C. § 2510(8);
- Whether Defendant's conduct constitutes interception of electronic communications in violation of Cal. Penal Code § 631(a);
- Whether Defendant's conduct constitutes intentional interception of electronic communications in violation of 18 U.S.C. § 2511(1)(a);
- Whether Defendant's conduct constitutes an unlawful or unfair business practice under Cal. Bus. & Prof. Code § 17200;
- Whether Plaintiff and Class Members are entitled to statutory damages;
- Whether Class Members are entitled to injunctive relief;
- Whether Defendant's conduct violates the California Constitution;
- Whether Defendant's conduct constitutes an intrusion upon seclusion;
- Whether Class Members are entitled to disgorgement of data unlawfully obtained; and
- Whether Class Members are entitled to restitution.

70. **TYPICALITY:** As a person who visited the Website and whose URL contents were intercepted by the Trackers, Plaintiff is asserting claims that are typical of the Class Members. Plaintiff's experience with the Trackers is typical to Class Members, who likewise had their URL contents intercepted by the Trackers and transmitted to third parties.

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

71.    **ADEQUACY:** Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially in conflict with those of the Class are excluded from the Class.

72.    **SUPERIORITY:** A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not.

## VIII.  FIRST CAUSE OF ACTION

### Violations of Cal. Penal Code § 631

### By Plaintiff and the Class Members Against All Defendants

73.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

74.    Plaintiff brings this cause of action on behalf of himself and the Class.

75.    California Penal Code § 631(a) prohibits any person from willfully and without the consent of all parties to the communication reading, or attempting to read, or learning the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state. The statute further prohibits aiding, agreeing with, employing, or conspiring with any person to do the same.

76.    The full URLs of Plaintiff's and Class members' HTTP requests to the Website constitute the "contents" of those communications within the meaning of § 631(a). As described in the preceding tracker-specific allegations, the Trackers intercepted those URL contents, paired them with persistent user identifiers in the same outbound requests, and transmitted them to third-party servers in real time and during the page-load process.

77.    Defendant intentionally configured the Website to transmit Plaintiff's and Class members' URL contents to the Trackers, itself received and used those URL

23

contents for audience segmentation and ad targeting, and permitted the Trackers to use those URL contents for their own independent commercial purposes, all without Plaintiff's or Class members' knowledge or consent.

78.    Each interception constitutes a separate violation of § 631(a). Plaintiff and the Class are entitled to recover the greater of actual damages or $5,000 per violation pursuant to Cal. Penal Code § 637.2(a)(1), injunctive relief, and reasonable attorney's fees and costs.

## IX.    SECOND CAUSE OF ACTION

### Violations of 18 U.S.C. § 2511(1)(a)

### By Plaintiff and the Class Members Against All Defendants

79.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

80.    Plaintiff brings this cause of action on behalf of himself and the Class.

81.    18 U.S.C. § 2511(1)(a) prohibits any person from intentionally intercepting any wire, oral, or electronic communication. The Federal Wiretap Act defines "contents" to include any information concerning the substance, purport, or meaning of a communication. 18 U.S.C. § 2510(8).

82.    The full URLs of Plaintiff's and Class members' HTTP requests to the Website are "contents" of electronic communications within the meaning of 18 U.S.C. § 2510(8). Those URLs communicate the substance and meaning of Plaintiff's and Class members' communications with the Website, including what they were viewing and what subject matter they were researching.

83.    Defendant intentionally configured the Website to transmit Plaintiff's and Class members' URL contents to each Tracker, itself received and used those URL contents for audience segmentation and ad targeting, and permitted each Tracker to use those URL contents for its own independent commercial purposes.

84.    Plaintiff and the Class are entitled to relief under 18 U.S.C. § 2520, including the greater of actual damages plus any profits made by Defendant through the

24

interception, or statutory damages of $100 per day per violation or $10,000, whichever is greater, plus punitive damages, equitable relief, and reasonable attorney's fees and costs.

## X.    THIRD CAUSE OF ACTION

### Violations of Business & Professions Code § 17200

### By Plaintiff and the Class Members Against All Defendants

85.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

86.    Plaintiff brings this cause of action on behalf of himself and the Class.

87.    California Business and Professions Code § 17200 prohibits any unlawful, unfair, or fraudulent business act or practice. Defendant's conduct constitutes both an unlawful and an unfair business practice.

88.    Defendant's conduct is unlawful. By facilitating the interception of the contents of Plaintiff's and Class members' electronic communications without consent, Defendant violated California Penal Code § 631(a) and 18 U.S.C. § 2511(1)(a).

89.    Defendant's conduct is also unfair. Defendant covertly transmitted Plaintiff's and Class members' URL contents to third-party Trackers for commercial monetization without disclosure, authorization, or compensation. The harm to Plaintiff and Class members substantially outweighs any utility of Defendant's conduct, the conduct is immoral, unethical, oppressive, and unscrupulous, and the conduct violates established public policy as reflected in the California Invasion of Privacy Act, the Federal Wiretap Act, and Article I, Section 1 of the California Constitution.

90.    Plaintiff and Class members suffered injury in fact and lost money or property as a result of Defendant's conduct. Browsing data identifying the specific content a user views, including browsing URLs of the kind intercepted here, has recognized economic value in the digital advertising marketplace. Defendant and the Trackers monetized that data without compensating Plaintiff or the Class Members.

/ / /

25

91.    Plaintiff and Class members provided their browsing data as implicit consideration for access to the Website, a data-for-services exchange that was not disclosed and to which they did not consent. Defendant and the Trackers are deemed unjustly enriched in the amount of that uncompensated transfer of value.

92.    Plaintiff and the Class are entitled to injunctive relief prohibiting Defendant from continuing its unlawful and unfair practices, restitution of monies acquired by Defendant through those practices, and reasonable attorney's fees and costs.

## XI.    FOURTH CAUSE OF ACTION

### Violation of the California Constitution, Article I, Section 1

### By Plaintiff and the Class Members Against All Defendants

93.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

94.    Plaintiff brings this cause of action on behalf of himself and the Class.

95.    Article I, Section 1 of the California Constitution provides that privacy is among the inalienable rights of all people in California. To state a claim for violation of the constitutional right to privacy, a plaintiff must establish (1) a legally protected privacy interest, (2) a reasonable expectation of privacy in the circumstances, and (3) conduct constituting a serious invasion of privacy.

96.    Plaintiff and Class Members have a legally protected privacy interest in the contents of their electronic communications with the Website, including the specific page URLs reflecting their browsing activity. California law recognizes a substantial privacy interest in the substance of an individual's electronic communications, including communications that reveal the user's areas of interest, the questions the user is researching, and the personal subject matter the user is consuming.

97.    Plaintiff and Class Members had a reasonable expectation of privacy in the contents of their electronic communications with the Website. A reasonable person visiting an online news website providing news reporting and editorial content does not expect that the specific URLs identifying the articles they read, including those

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

identifying sensitive health-related, mental-health-related, substance-use-related, and identity-related content, will be transmitted in real time to multiple third-party commercial entities and paired with persistent identifiers tying those communications to the user across browsing sessions.

98. Defendant's conduct constitutes a serious invasion of that privacy. By deliberately embedding and configuring three third-party tracking technologies on the Website, Defendant caused the real-time, covert interception of the URL contents of Plaintiff's and Class Members' electronic communications, including the URLs identifying sensitive health-related, mental-health-related, substance-use-related, and identity-related content, and caused those contents to be paired with persistent user identifiers and transmitted to multiple third-party commercial entities for commercial exploitation.

99. As a result of Defendant's invasion of their privacy, Plaintiff and Class Members have suffered harm, including loss of privacy, loss of control over their personal information, and the unauthorized commercial exploitation of their browsing data.

## XII.  FIFTH CAUSE OF ACTION

### Intrusion Upon Seclusion

### By Plaintiff and the Class Members Against All Defendants

100. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

101. Plaintiff brings this cause of action on behalf of himself and the Class.

102. The common law tort of intrusion upon seclusion requires: (1) an intentional intrusion, physically or otherwise, into a place, conversation, or matter in which the plaintiff has a reasonable expectation of privacy; and (2) that the intrusion would be highly offensive to a reasonable person.

103. Defendant intentionally intruded into Plaintiff's and Class Members' electronic communications with the Website by deliberately embedding three third-party

27

tracking technologies that intercepted the URL contents of those communications, paired those contents with persistent user identifiers, and transmitted them to third-party commercial entities in real time and during the page-load process.

104. The intrusion is highly offensive to a reasonable person. Defendant covertly deployed tracking technologies that captured the specific content Plaintiff was browsing and transmitted it to multiple third-party commercial entities for ad targeting, audience segmentation, and broader commercial exploitation, all without disclosure or consent and all in connection with content addressing sensitive personal subject matter including substance use, mental health, and identity.

105. As a result of Defendant's intrusion upon their seclusion, Plaintiff and Class Members have suffered harm, including loss of privacy, emotional distress, and the unauthorized exploitation of their personal information. Plaintiff and the Class are entitled to compensatory and nominal damages.

## XIII. <u>SIXTH CAUSE OF ACTION</u>

### Unjust Enrichment

### By Plaintiff and the Class Members Against All Defendants

106. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

107. Plaintiff brings this cause of action on behalf of himself and the Class.

108. Unjust enrichment requires: (1) a benefit conferred on the defendant; (2) at the expense of the plaintiff; and (3) circumstances that make it inequitable for the defendant to retain the benefit without compensating the plaintiff.

109. Defendant received a benefit by permitting third parties to deploy their tracking technologies on the Website. In exchange for allowing these third parties to intercept and collect the URL contents of visitors' communications with the Website, Defendant received monetary compensation and access to audience-targeting capabilities that supported the sale of advertising on the Website.

/ / /

28

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

110.    Defendant received this benefit at Plaintiff's and Class Members' expense. Plaintiff's and Class Members' browsing data constitutes personal property with recognized economic value in the digital advertising marketplace. By intercepting and monetizing that data without disclosure or compensation, Defendant deprived Plaintiff and Class Members of the value of their browsing data.

111.    It is inequitable for Defendant to retain the benefits of its data-for-services arrangement without compensating Plaintiff and Class Members whose browsing activity was the source of that commercial value. Defendant's concealment of the tracking conduct, and its failure to disclose the existence and operation of the Trackers in a manner that would permit informed consent, render its retention of the benefits unjust.

112.    Plaintiff and the Class seek restitution and disgorgement of all amounts by which Defendant was unjustly enriched at Plaintiff's and Class Members' expense.

## XIV.  **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for the following:

1.    An order certifying the Class, naming Plaintiff as Class representative, and naming Plaintiff's attorneys as Class counsel;

2.    An order declaring that Defendant's conduct violates Cal. Penal Code § 631(a), 18 U.S.C. § 2511(1)(a), Cal. Bus. & Prof. Code § 17200, et seq., Article I, Section 1 of the California Constitution, and the common law prohibition against intrusion upon seclusion and unjust enrichment;

3.    An order enjoining Defendant from continuing the conduct alleged herein;

4.    Statutory damages pursuant to Cal. Penal Code § 637.2(a)(1) of $5,000 per violation;

5.    Statutory damages pursuant to 18 U.S.C. § 2520 of the greater of actual damages plus any profits made by Defendant through the violation, or $100 per day per violation or $10,000, whichever is greater;

6.    Punitive damages pursuant to 18 U.S.C. § 2520;

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

7.    Restitution pursuant to Cal. Bus. & Prof. Code § 17200, et seq.;

8.    Nominal damages and injunctive relief for violation of Article I, Section 1 of the California Constitution;

9.    Compensatory and nominal damages for intrusion upon seclusion;

10.   Restitution and disgorgement of all amounts by which Defendant was unjustly enriched at Plaintiff's and Class Members' expense;

11.   Prejudgment interest;

12.   Reasonable attorney's fees and costs; and

13.   Such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

113.   Plaintiff hereby demands a trial by jury on all causes of action and issues so triable.

Respectfully submitted,

Dated:   July 3, 2026                          **NATHAN & ASSOCIATES, APC**

By: */s/ Reuben D. Nathan*
Reuben D. Nathan
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

**LAW OFFICES OF ROSS CORNELL, APC**
Ross Cornell, Esq. (SBN 210413)
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

*Attorneys for Plaintiff and the Putative Class*

30

CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED